Filed 9/15/20  P. v. Moreno CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY MORENO,<br><br>Defendant and Appellant. | B291857<br><br>(Los Angeles County<br>Super. Ct. No. VA141778) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed and remanded with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Noah P. Hill and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Anthony Moreno appeals from a judgment entered after the jury convicted him of first degree murder and possession of a firearm by a felon.  The jury found true Moreno personally used and intentionally discharged a firearm causing the victim's death.  The jury also found Moreno committed the crimes for the benefit of a criminal street gang.

On appeal, Moreno contends (1) the trial court prejudicially erred by failing to instruct the jury that a conspirator can be an accomplice, whose testimony must be viewed with caution and corroborated by other evidence; (2) the court prejudicially erred in limiting the defense gang expert's testimony and admonishing him in a threatening manner; (3) the court prejudicially erred in failing to provide a playback of the audiotape of a witness interview in response to the jury's request during deliberations for the direct examination of the witness; (4) the court prejudicially erred in admitting a detective's description of Moreno as "crazy," but knowing what he was doing, and Moreno's jail-cell statements to a confidential informant; and (5) the court committed instructional error in defining the primary activities element of the gang enhancement.

Moreno also claims multiple sentencing errors.  He argues the trial court erred by not staying the sentence on the firearm

possession conviction pursuant to Penal Code section 654.[1] Moreno also contends, the People concede, and we agree the abstract of judgment must be corrected to reflect the court's imposition and stay of the firearm enhancement for Moreno's personal use of a firearm under section 12022.53, subdivision (b). Finally, Moreno requests we remand for the trial court to conduct a hearing on his ability to pay the court assessments and restitution fines pursuant to this court's opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm the judgment as modified but remand for the trial court to allow Moreno to request a hearing and present evidence demonstrating his inability to pay the court assessments and restitution fines.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Amended Information*

The amended information charged Moreno with willful, deliberate, and premediated murder (§ 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). As to count 1, the amended information specially alleged Moreno personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (*id.*, subd. (c)), and personally and intentionally discharged a firearm causing death (*id.*, subd. (d)). As to both counts, the amended information alleged the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C) [count 1]; *id.*, subd. (b)(1)(A) [count 2].)

---

[1]    All further undesignated statutory references are to the Penal Code.

3

B.    *The Prosecution's Case*

     1.    *The murder*

Moreno was a member of the Artesia 13 gang. Moreno and fellow gang members used a detached garage in Artesia as a hangout. The garage walls were covered with Artesia 13 gang graffiti. Fellow gang member James "Lonely" Roberts[2] testified Moreno lived in either the front house or the garage, but on cross-examination Roberts admitted he had no "specific knowledge" of that fact.[3]

On the night of November 24, 2015, Moreno and fellow gang members Roberts, Austen "Risky" Evans, and Dennis "Meklo" Mello, gang member or associate Raul "Sean John" Ruiz, gang associate Christina "Boxer" Martin,[4] and Dawn "Molly" McEveety[5] were together in the garage. Everyone was smoking crystal methamphetamine. Roberts testified Moreno sat on a couch about five to six feet from McEveety, who was seated on a

---

[2]    Roberts testified pursuant to a grant of immunity while in custody as a witness in the case.

[3]    Moreno told a confidential informant he only used the house as his mailing address. The house and garage were located in territory claimed by the Artesia 13 gang.

[4]    Evans and Mello testified pursuant to a grant of immunity. Evans was in custody for three months because he refused to appear on a subpoena in the case. Martin was also given a grant of immunity, but she repeatedly refused to testify at trial.

[5]    Nineteen-year-old McEveety had a drug addiction and started socializing with Artesia gang members sometime in 2015. McEveety lived in the front house on the same property as the garage.

reclining chair looking at her smartphone. According to Evans, Moreno was sitting in a wheelchair, "off by himself" and "just real quiet." Evans, his girlfriend Martin, Roberts, Mello, and Ruiz were in a group seated on plastic chairs across from Moreno and McEveety, talking and "getting high a little bit." Another group of eight people were talking by a computer in the back corner of the garage. At some point Roberts and Evans saw a police car on the television monitor, which was connected to a security camera facing the alley next to the garage.

Approximately 15 minutes after the police car drove by, Moreno pulled out a rifle case from under the couch where he was sitting, and he removed a .22-caliber rifle from the case.[6] Moreno sat holding the rifle for two minutes on his lap before saying, "Nobody—not everybody run at one time." Then, without saying anything further, Moreno chambered a round, pointed the rifle at the side of McEveety's head, and pulled the trigger. When the bullet hit McEveety's head, she raised her hands to the side of her head, jumped slightly, and looked over at Moreno. Moreno chambered another round and shot McEveety in the head a second time.

Mello did not see the shooting, but he heard two shots. After the first shot, Mello looked around and saw McEveety holding the left side of her head with her left hand. There was a pause, and then Mello heard a second shot. Moreno said, "Don't fuckin' run." Mello looked at Moreno and realized Moreno had shot McEveety. Mello was certain Moreno had shot McEveety because Moreno was the only one in the garage with a gun.

---

[6] Roberts testified he knew the rifle was a .22-caliber because he had seen it before and "it was for the house."

5

Evans testified everyone "was taken by surprise" and "in shock." According to Evans, after the shooting Moreno looked around the garage and said, "All right. Help me bag her up." Mello was the first person to run outside after the shooting. Roberts testified he got up and said, "What the hell?" Then he exited the garage in shock. Evans and Martin remained in the garage for two to three minutes before leaving.

Evans, Mello, and Roberts testified they did not know Moreno was going to shoot or kill McEveety and did not take part in her killing. Roberts had been intimate with McEveety a week before her death and considered her a friend. Evans and Roberts were not aware of any paperwork showing McEveety was a snitch working with law enforcement.

2.    *The investigation*

On November 29, 2015 Los Angeles County Sheriff's Deputy Jesus Perez and another deputy responded to a radio call reporting an abandoned red hatchback car[7] located by the boundary of Pico Rivera and Whittier. When Deputy Perez arrived, the other deputy asked him to assist in opening the hatchback door to inspect an ice chest in the back seat.[8] They opened the ice chest and found a dead body inside. They closed

---

[7]    The owner testified his vehicle was stolen from his apartment complex in La Habra in the early morning of November 25, 2015 (described by him as the day before Thanksgiving).

[8]    The vehicle's owner testified the ice chest did not belong to him. Roberts testified he had seen a large ice chest about three feet long in the garage.

the ice chest and the hatchback door, secured the scene, and called the homicide bureau.

Los Angeles County Sheriff's Detective Domenick Recchia arrived at the scene that afternoon.  He saw the body of a young female in the ice chest.  The body was transported to the coroner's office, where it was identified as McEveety based on her fingerprints.  Detective Recchia viewed McEveety's body at the coroner's office and observed her pants were low on her waist and "one of her pant legs was kind of exposed over her foot as if someone either tried to take her pants off or put her pants back on."  DNA recovered from the ice chest handle matched that of Ruiz.  Moreno's DNA and fingerprints were not recovered from the ice chest or vehicle.

Deputy medical examiner Job Augustine concluded McEveety died from two gunshots wounds to the left side of her head in a homicide.  In addition, McEveety suffered a gunshot wound on her left hand.  Augustine opined one of the bullets went through McEveety's left hand before entering her head.  There was no evidence McEveety had been sexually assaulted.

After learning of McEveety's identity, Detective Recchia contacted her family.  McEveety's mother provided Detective Recchia with McEveety's Facebook account and username.  One of McEveety's sisters notified Detective Recchia of two Facebook posts by Lorna Ramos, one of McEveety's Facebook friends.  Ramos knew McEveety through her son Robert Villasenor, who was an Artesia 13 gang member.  Ramos's computer password was Arta 13.

On November 28, 2015 at 6:32 p.m., Ramos had posted on her Facebook profile, "RIP Molly."  The next morning Ramos posted a second Facebook message, "So young, so sad."  Ramos

7

made both Facebook posts before law enforcement found McEveety's body. Ramos initially told Detective Recchia she heard about McEveety's death on the news. When Detective Recchia told Ramos the media did not report about McEveety's death until after Ramos's posts, Ramos stated she saw someone else post about the death on Facebook. Ultimately Ramos admitted her cousin Delia had told her about McEveety's death. Ramos was not sure if her cousin was an Artesia 13 gang member.

McEveety's family reported McEveety did not have a cell phone plan, and therefore her smartphone "would only be active if she was connected to the internet [with] an I.P. address." Detective Recchia subpoenaed McEveety's Facebook and cell phone records, which showed she last accessed her Facebook account on the day of the shooting at 7:34 p.m. at the location of the back house on the property where the garage was located. Detective Recchia visited the garage, turned on his cell phone, and was able to pick up the wireless internet signal from the owner of the back house, as well as two or three other wireless internet signals. Detective Recchia observed furniture had been moved outside the garage, including a sofa. The garage had been cleaned with bleach and the graffiti on the walls had been freshly painted over. He did not find any DNA in the garage that matched that of Moreno.

3. *Moreno's jail-cell admissions*

On January 28, 2016 Detective Recchia learned Moreno was in custody unrelated to the shooting. Detective Recchia

8

placed a confidential informant (CI)[9] in the same jail cell as Moreno.  To stimulate conversation, Detective Recchia and his partner, Detective John O'Brien, showed Moreno photographs of McEveety and told Moreno he was a suspect in her sexual assault and murder.  Moreno told the detectives he did not know McEveety.

Once Moreno was back in the jail cell with the CI, they talked over the course of three to four hours, a portion of which was played to the jury.  According to Detective Recchia, most of the conversation about the shooting occurred after Moreno and the CI had spent about three hours together.  During their initial exchange about the shooting, the CI raised a concern about how the gang would respond to Moreno shooting a female.  The CI stated, "It's not good.  Doesn't mean it's over, homey, you know?  What you have to do, if you did it, homey, your reason why for doing it, homey because to begin with, it's a hina.  Nobody wants to owe fucking smoke to hina. . . .  It's like, if it's a mother fucker, fuck, yeah, I did him out.  But a bitch?  You know how it is."  The CI then suggested, "It's how you spin it.  Hey, if she did something, homie, she was a rata.  She was fucking doing some way-out shit.  She tried to burn you for some shit or something.  Hey, that's your explanation.  That's why I did it.  It's simple.  You fabricate the shit."

---

[9]      The detectives gave the CI "a synopsis" of the shooting. The CI had visible gang tattoos, wore inmate clothing, and was placed in a wheelchair for the ruse.  Detective Recchia, who had used the CI in the past, paid him $1,500 for the operation.  Both the CI and the jail cell were wired to record the conversation. Detective Recchia listened to Moreno's conversation with the CI from a different room.

At some point after this exchange, Moreno said to the CI, "I know I could beat it, holmes.  They ain't—they don't have nothing on me."  Moreno denied knowing McEveety.  But later Moreno admitted he shot McEveety "twice in the dome" while he was sitting on the couch.  Moreno then explained, "She was an informant, homey.  And my homeboy just brought her around, but the homies didn't know that she was one . . . ."  When the CI asked if Moreno acted alone, Moreno responded, "I took action on my own, dog."  Moreno said he knew McEveety was a former prostitute who worked as an informant because he "saw the papers."[10]  The paperwork showed McEveety's first name was Dawn, but she was using Molly as her "fake name."  Moreno did not say anything in front of McEveety because "[s]he'll be in there just like—she'll smoke a little dope, play on the phone" and "[h]ear everybody fucking talking."

Moreno said that after he shot McEveety, he told his 10 "homeboys" not to leave, but they all left the garage.  Moreno explained why his fellow gang members may have turned on him, "I guess some of the homies were freaked out because I did that.  And I'm like, 'Fuck that bitch, homey.  She's a snitch, fool.'"  Moreno later added, "I should've just handled all of them, right—right when they walked out the door, I'm plugging them, pop, pop, pop."

Moreno stated the .22-caliber weapon did not "make a big splat," but the blood "sorta splattered on the couch."  Moreno indicated other gang members, not the ones that left the garage after the shooting, helped him by disposing McEveety's body and

---

[10]    Detective Recchia conducted a search of department records and could not find any documents that suggested McEveety had previously worked with law enforcement.

scrubbing the blood off the couch. Moreno did not help put McEveety's body in the ice chest. Moreno stated his DNA was not on McEveety. He added, "No blood is on my wheelchair or nothing, dog, no gunpowder or nothing." Moreno told the CI he took the barrel off the weapon, threw the barrel in the ocean, and burned the rest of the weapon "to ash."

### 4. *The witness interviews*

Based on Ramos's Facebook posts and her son's connection with the Artesia 13 gang, in February 2016 Detectives Recchia and O'Brien interviewed Artesia 13 gang members and associates, including Evans, Roberts, Mello, and Ruiz.[11] During his February 2, 2016 interview, Evans initially denied he was present when McEveety died. Later in the interview, Evans identified Moreno as the person who shot and killed McEveety. Evans also stated Ruiz told him "they took care of" McEveety's remains.

In his February 9, 2016 interview, Mello also initially denied being present during McEveety's death. But he later admitted to being present after the detectives told him his DNA was on the ice chest and he could be charged as an accessory to

---

[11] The detectives interviewed Evans, Roberts, Mello, and Ruiz while they were in custody on matters unrelated to McEveety's killing. Detective Recchia surreptitiously recorded the interviews and used ruses to induce them to talk. Evans and Mello responded to questions about the interviews during their examination at trial. The prosecutor also played the audio recording of Robert's interview to the jury during Roberts's redirect examination.

McEveety's murder.  Mello told the detectives he saw Moreno holding a rifle at the time McEveety was shot.

In his February 10, 2016 interview, Ruiz initially denied knowing McEveety or witnessing her death.  Detective O'Brien told Ruiz eight or nine other people told him the same story and if Ruiz said something different, Ruiz could become an accessory.  Ruiz continued to deny any involvement with McEveety's death.  But when Detective O'Brien stated "the guy we arrested for this is special needs," Ruiz responded, "Hot Wheels?"  Detective O'Brien replied, "Yeah . . . .  So I—I can't lead you in a direction here.  That's why I need you to be truthful with me."  Ruiz said, "I don't want them to think that I'm a, fucken, a rat or something like that."

Eventually Ruiz provided details of the incident.  He stated he had his back to McEveety, so he did not see anything, but he heard "a little pellet gun" fire twice.  After he heard the first gunshot, he turned and told Moreno, who was pointing the gun at McEveety, "Man, why do you gotta point that thing at people?"  He heard a second gunshot, and Moreno said, "Nobody run."  Ruiz then followed Roberts out the door.  Ruiz said Moreno was a "wacko" and "wasn't all there."  Ruiz denied he helped move McEveety's body.  The large ice chest in the garage was used to store drinks, and Ruiz sometimes would get a beer or soda from the ice chest.

In his February 25, 2016 interview, Roberts initially denied he was at the garage on the evening McEveety was killed or had any role in moving McEveety's body.  Detective Recchia continue to push Roberts to tell his side of the story to "clear [him]" of responsibility for the killing.  Roberts ultimately admitted he was in the garage the night of the shooting.  He was sitting across the

12

room when he heard a gunshot and saw McEveety looking shocked and dazed. Then Roberts saw Moreno point the gun at McEveety and fire a second gunshot. Roberts saw McEveety's head drop, and she was "fucken gone." Roberts did not hear any argument between Moreno and McEveety before the shooting, but he speculated there was some tension between them because Moreno tried to talk to her for a hook up, but she would "shine him on." Roberts described the gun as a small rifle.

5.    *Prosecution's gang expert testimony*

Los Angeles County Sheriff's Detective Esteban Soliz, who was assigned to the gang unit for eight and a half years, testified as the prosecution's gang expert. Detective Soliz described the Artesia 13 gang as a primarily Hispanic gang with approximately 160 documented members, some of whom were not active. Detective Soliz opined Moreno was a documented member of the gang with the moniker "Sharkey," based on his gang tattoos and his admission of gang membership to Detective Soliz in a 2004 consensual street encounter.

Detective Soliz testified that within Hispanic gangs, a gang member would be disciplined or killed if he commits a violent crime against a woman without cause. An acceptable reason for violence would be documentation the female was a snitch (an informant). In the gang culture, "[i]f someone's snitching, they will be killed" The level of violence that is appropriate for a female (or any gang member) who is documented to be a snitch is determined by the person in charge, called the "llavero of [the] gang." For an Artesia 13 gang member to obtain approval to kill or seriously injure a snitch, the member must substantiate with documentation that the person was serving as an informant.

13

Detective Soliz explained, "So there is a vote in some ways in the street level because the llavero can tell that person that found the documentation, 'no, you can't' or 'you found it, you finish it.'" This is in contrast to the Mexican Mafia that operates in state prison, in which a gang member needs to obtain the unanimous vote of the gang members in charge of the gang to kill a fellow gang member.

Detective Soliz opined in response to a hypothetical based on the facts of this case that the killing of McEveety was committed at the direction of and for the benefit of the Artesia 13 street gang. Killing an informant working with law enforcement benefited the gang. Further, the murder was in association with the gang because the shooter was physically disabled and needed the help of fellow gang members to dispose of the victim's body. Detective Soliz also opined the unlawful possession of a firearm by the shooter was for the benefit of the gang.

On cross-examination, Detective Soliz opined if the investigating officer did not find any documentation that the victim was an informant, the murder would still be for the benefit of the gang, but may not have been at the direction of the gang. Detective Soliz explained, "If he didn't have paperwork and didn't check with the person with the keys of the neighborhood or in some way verify, he can [still] be doing it for the benefit of the gang in some way. He can still be taking credit for the murder of a rat or snitch. But then when the crime is completed he would still need to show why he did it and have to deal with the consequences . . . ." Assuming the gang member shot a woman who was neither a snitch nor a gang member and no one else knew in advance he would shoot her, the shooting was not done at the direction of the gang.

14

Detective Soliz admitted that at the preliminary hearing he incorrectly testified the Artesia 13 gang required the vote of 30 to 40 active gang members before a suspected snitch could be killed. He testified about the need for approval of the llavero for the first time at trial. Detective Soliz explained that at the preliminary hearing he was confused and was thinking about the Mexican Mafia when he testified about the required vote of the Artesia 13 gang. However, Detective Soliz admitted he "never handled a case" where a snitch was killed by an Artesia 13 gang member without there first being a vote.

C.      *The Defense Case*

Martin Flores, who was on the Los Angeles Superior Court gang expert panel, testified on behalf of Moreno. Flores stated the sexual assault or killing of a woman who was not a gang member or a snitch was not tolerated by Hispanic gangs and would result in the gang member's beating or death. Defense counsel presented a hypothetical in which an active Artesia 13 gang member in a garage shoots a female who was not a gang member and was not an informant, there was no paperwork suggesting she was an informant, both gang and nongang members were present, everyone was doing drugs, and the gang members were caught by surprise by the shooting. Flores opined that under those facts the crime was not committed for the benefit of, at the direction of, or in association with the gang. Flores explained, "Based on this hypothetical the individual is not following anybody's instructions, the individual is not associating in the capacity to commit the act, and the act in itself is not one that is warranted in gang culture."

15

When defense counsel added to the hypothetical that a gang member who was present was asked after the shooting if he was proud of it and he responded, "'Well I wouldn't be,'" Flores again opined on those facts the shooting was not committed for the benefit of, at the direction of, or in association with the gang. When asked to assume the shooter was "barking orders at the other people" after the shooting and needed assistance because of his disability, Flores stated this would not change his opinion because "the individual is barking . . . [his] personal instructions[,] not authorized gang instructions."

D.    *The Verdicts and Sentences*

The jury found Moreno guilty of the willful, deliberate, and premediated first degree murder of McEveety (§ 187, subd. (a); count 1).  The jury also found true the special allegations Moreno personally used and personally and intentionally discharged a firearm causing McEveety's death (§ 12022.53, subds. (b)-(d)). The jury further found Moreno guilty of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).[12]  As to both counts, the jury found true the special allegation the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).

The trial court sentenced Moreno on count 1 to 25 years to life for first degree murder plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).[13]  On

---

[12]    The parties stipulated during the trial Moreno had suffered a felony conviction in 2015.

[13]    The court also imposed a 10-year firearm enhancement under 12022.53, subdivision (b), and a 20-year firearm

16

count 2, the court selected the middle term of two years for possession of a firearm by a felon plus the middle term of three years for the gang enhancement (§ 186.22, subd. (b)(1)(C)) for a five-year determinate term to run concurrently with the sentence on count 1.

The court imposed a $30 court facilities assessment (Gov. Code, § 70373) and a $40 court operations assessment (Pen Code, § 1465.8, subd. (a)(1)) on each count. The court also imposed a restitution fine of $300 (*id.,* § 1202.4, subd. (b)) and imposed and suspended a parole revocation restitution fine in the same amount (*id.,* § 1202.45). At sentencing, Moreno did not object to imposition of the assessments and fines or raise his inability to pay.

Moreno timely appealed.

## DISCUSSION

A.    *Any Error in the Trial Court's Failure To Provide a Complete Instruction on Accomplice Testimony Was Harmless*

Moreno contends the trial court erred in failing to instruct the jury on accomplice testimony with respect to conspirators because there was evidence the witnesses in the garage, as members of the Artesia 13 gang, would have voted to approve the killing of McEveety, making them conspirators but not aiders and

---

enhancement under 12022.53, subdivision (c). But the court stayed both enhancements pursuant to section 12022.53, subdivision (f), because of its imposition of the firearm enhancement under section 12022.53, subdivision (d).

17

abettors.  Even if the trial court should have instructed the jury on a broader definition of an accomplice, any error was harmless.

1.    *Jury instruction on accomplice testimony*

During trial, defense counsel requested the trial court instruct the jury on accomplice testimony with CALCRIM No. 334.  Defense counsel argued the jurors could believe the witnesses were accomplices "because the gang expert Detective Soliz had previously testified that Artesia 13 would all have to agree to have a hit on a snitch.  [¶]  If the jurors believe his previous testimony instead of his testimony here where he says he made a mistake and wasn't thinking of Artesia 13, these people could be accomplices and in that case the law with respect to how their testimony can be considered changes."  The People opposed the trial court giving the instruction, arguing there was no evidence to support prosecution of the witnesses in the garage for the murder.  Neither counsel addressed whether the instruction should include coconspirators.  The trial court indicated it would rule after it had time to research the issue.

The trial court later instructed the jury with CALCRIM No. 334 as modified, "Before you may consider the statement or testimony of Christina Martin, Austen Evans, James Roberts, Raul Ruiz and Dennis Mello as evidence against the defendant regarding the crime of murder, you must decide whether Christina Martin, Austen Evans, James Roberts, Raul Ruiz and Dennis Mello were accomplices to that crime.  [¶]  A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant.  Someone is subject to prosecution if 1, he or she personally committed the crime; or 2, he or she [] knew the criminal purpose of the person who

18

committed the crime; and 3[,] he or she intended to and did in fact aid, facilitate, promote[,] encourage or instigate the commission of the crime.  [¶]  The burden is on the defendant to prove that it is more likely than not that Christina Martin, Austen Evans, James Roberts, Raul Ruiz and Dennis Mello were accomplices.  [¶]  A person may be an accomplice even if he or she is not actually prosecuted for the crime.  [¶]  If you decide that a declarant or witness was not an accomplice then supporting evidence is not required and you must evaluate his or her testimony—statement or testimony as you would that of any other witness."  The trial court did not include in its instruction the alternative language in CALCRIM No. 334 that a person may be an accomplice if he or she "participate[s] in a criminal conspiracy to commit the crime."

The trial court continued, "If you decide that a declarant or witness was an accomplice then you may not convict the defendant of murder based on his or her statement or testimony alone.  You may use that statement or testimony of an accomplice to convict the defendant only if, 1, the accomplice's statement or testimony is supported by other evidence that you believe; 2, that supporting evidence is independent of the accomplice's statement or testimony; 3, the supporting evidence tends to connect the defendant to the commission of the crime.  [¶]  Supporting evidence, however, may be slight.  It does not need to be enough by itself to prove that the defendant is guilty of the charged crime . . . .  [¶]  Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  [¶]  You may not, however, arbitrarily disregard it.  You should give that statement or testimony the weight you think it

19

deserves after examining it with care and caution and in light of all the other evidence."

2.      *Governing law*

"An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1224; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 93 [the definition of accomplice "'encompasses all principals to the crime [citation], including aiders and abettors and coconspirators'"].) ""An accomplice must have "'guilty knowledge and intent with regard to the commission of the crime.'""" (*Houston*, at p. 1224; accord, *People v. Lewis* (2001) 26 Cal.4th 334, 369.) "If there is evidence to permit a jury to find by a preponderance of the evidence the witness was an accomplice, '"the trial court must instruct the jury that the witness's testimony should be viewed with distrust."'" (*People v. Hinton* (2006) 37 Cal.4th 839, 879; accord, *Lewis*, at p. 369.) ""But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony."'" (*Hinton,* at p. 879; accord, *Lewis*, at p. 369.)

"[S]ection 1111 provides that an accomplice's testimony cannot support a conviction without corroboration by other evidence 'as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 945; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 307.) "A court

20

must instruct on the need for corroboration only for accomplice *testimony* (§ 1111); "'"testimony' within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances."'" (*People v. Williams* (1997) 16 Cal.4th 635, 682; accord, *Hoyt*, at p. 946.) "'"The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police."'" (*Hoyt*, at p. 946; accord, *People v. Williams* (1997) 16 Cal.4th 153, 245.)

"In order for the jury to rely on an accomplice's testimony, "'[t]he corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime."'" (*People v. Gomez, supra*, 6 Cal.5th at p. 308; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 505.) "'"The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." [Citations.] The evidence "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and "'may be circumstantial or slight and entitled to little consideration when standing alone."'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 628; accord, *People v. Romero and Self* (2015) 62 Cal.4th 1, 32.)

21

3.  *Even if the trial court erred in failing to include conspirators as accomplices in the jury instruction, any error was harmless*

Moreno points to Detective Soliz's preliminary hearing testimony that before an Artesia 13 gang member could kill a snitch, the member needed the vote of 30 to 40 active gang members to approve the killing. Although Detective Soliz clarified at trial he was confused when he offered this testimony and was thinking of the Mexican Mafia, he admitted he had never handled a case where a snitch was killed by an Artesia 13 gang member without there first being a vote. On this basis Moreno claims witnesses Evans, Mello, Roberts, and Ruiz[14] were conspirators to the murder because as fellow Artesia 13 gang members they would have voted to approve Moreno using a gun to kill McEveety for being a snitch.

Detective Soliz's testimony that there needed to be an Artesia 13 gang vote before Moreno could kill McEveety would have been thin evidence to support the prosecution of Evans, Mello, Roberts, and Ruiz as conspirators in the murder of McEveety and Moreno's possession of a firearm given the lack of any evidence to tie them to a vote, their denial of knowledge Moreno was going to kill McEveety, and Moreno's statements to

---

[14]  Moreno acknowledges there was conflicting evidence as to whether Ruiz was a gang member or associate. Ruiz told the detectives he was not an Artesia 13 gang member, but Mello testified Ruiz was a member. At trial Detectives Recchia and Soliz both thought Ruiz was an associate. However, Detective Recchia opined at the preliminary hearing that Ruiz was a gang member.

the CI that he "took action on [his] own" and "the homies didn't know" that McEveety was an informant.

But even if the trial court erred by failing to instruct the jury that the accomplice testimony instruction applied to conspirators, the error was harmless because there was sufficient evidence to corroborate the witnesses' testimony. (*People v. Anderson* (2018) 5 Cal.5th 372, 411 [error in failing to instruct as to need for corroboration of accomplice testimony "'is harmless if the record contains "sufficient corroborating evidence"'"]; *People v. Valdez* (2012) 55 Cal.4th 82, 147 ["A trial court's error in instructing on accomplice liability under section 1111 is harmless if the record contains 'sufficient corroborating evidence.'"]; *People v. Manibusan, supra*, 58 Cal.4th at p. 95 [same].) Moreno's admission to the CI that he shot McEveety "twice in the dome" and killed her was sufficient independent corroboration of the testimony of Evans, Roberts, Mello, and Ruiz. (See *People v. Whalen* (2013) 56 Cal.4th 1, 56 [defendant's statement he "was expecting to get picked up sooner or later" connected him to robbery and murder and "was sufficient independent corroboration" of accomplice testimony]; *People v. Davis* (2005) 36 Cal.4th 510, 546 [defendant's recorded comments linking him to murder, robbery, and kidnapping provided sufficient corroboration under § 1111]; *People v. Brown* (2003) 31 Cal.4th 518, 556 [defendant's statements that he killed the victim and took her truck corroborated accomplice's out-of-court statements]; *People v. Williams, supra*, 16 Cal.4th at pp. 659, 680 [defendant's admission he was present at the murder scene provided corroboration for the accomplice testimony].)

Moreno argues his admission to the CI did not provide sufficient corroboration because the jurors asked for readback of

Roberts's testimony about Moreno's relationship with McEveety, suggesting they disbelieved Moreno's statement to the CI that he killed McEveety because she was a snitch. Moreno also argues he lied to the CI about seeing paperwork showing McEveety was an informant, that McEveety was a former prostitute, and that he burned the gun "to ash." Thus, Moreno argues, the jury could have believed he fabricated the entire confession. Maybe so. But Moreno's confession, especially given his specificity in saying he shot McEveety twice in the head, provided sufficient independent corroboration of the witness testimony. On these facts, any error was harmless. (*People v. Anderson, supra*, 5 Cal.5th at p. 411; *People v. Valdez, supra*, 55 Cal.4th at p. 147.)

B.  *Moreno Forfeited His Challenges to the Trial Court's Exclusion of a Portion of Flores's Testimony and the Court's Subsequent Admonition*

1.  *The trial court's rulings and witness admonition*

At trial, defense counsel asked Flores to respond to the following hypothetical: "So assume a male with Artesia tattoos is in a garage, he shoots a female, the female is not a gang member, the female is not a snitch, there's no paperwork that backs up the person was a snitch, and the shooting is committed in the presence of gang members and non Arta gang members, and everybody in the room is using drugs. Do you have an opinion as to whether or not a crime such as that would have been committed for the benefit of the gang?" Flores answered, "Well, based on the hypothetical my opinion would be that that was a spontaneous act, an unplanned act, an unauthorized act for the fact that there [were] non gang members in the room. Factors that—."

The trial court interrupted, "I'm going to stop him. I'm going to ask counsel to approach the bench." At sidebar outside the presence of the jury, the court explained, "This goes too closely on the specific intent question. I think your question was fine, but the answer was not fine, and I'm concerned about that." Defense counsel replied, "I didn't know." The court stated, "I don't think counsel was asking for that, but he does this. I'm going to strike his answer and you can ask it again." In open court, the trial court struck Flores's answer and instructed the jury to not consider it for any purpose.

Defense counsel asked the hypothetical again and elicited Flores's opinions the shooting was not committed for the benefit of, at the direction of, or in association with the gang. Then defense counsel added to the hypothetical that there was no readily available getaway car and asked whether that would change Flores's opinion. Flores answered, "Again, it does not change my opinion because it furthers my opinion that this was an unplanned act. It further[s] my opinion—." The court again interrupted and struck Flores's answer as nonresponsive.

On the second day of Flores's testimony, the court addressed Flores before he took the stand (outside the presence of the jury): "Mr. Flores the court wants to admonish you that as an expert witness you may not testify to the ultimate facts for which the jury is sworn to decide. You know that. And I am admonishing you that if you venture once again into that territory then the court will recommend to the experts committee that you no longer be on a panel of experts. This court is on the experts committee, knows how experts are selected and vetted for our list and I want to make that clear to you. Do you understand?" Flores responded, "Yes. Can you be clear about

25

what—what part I'm missing?" The court answered, "You tried to testify Mr. [Moreno] couldn't form the intent. You know that. You've been an expert for a number of years. If you don't know the parameters you shouldn't be on the expert list." Flores replied, "I'm fully aware." The court added, "I'm not going to put up with it. . . . I don't appreciate this act either, by the way, and I understand you want clarification but you know what? If you'd listen carefully to [defense counsel's] questions she's asking you very specific things and I want the record to reflect [defense counsel] has not tried to solicit inappropriate information. I think you just continued to expand and expand and whatever avenue you think is beneficial to your position, and I don't appreciate it and I'm not going to have it. So I think I made myself clear."

Following the trial court's admonition, defense counsel posed another hypothetical based on the facts of the shooting and asked Flores whether the crimes were committed for the benefit of, at the direction of, or in association with the gang. Flores answered that they were not. Flores added that the shooting was not done in association with the gang because the "hypothetical indicates that the people in the room were all caught by surprise."

2.    *Governing law*

"California law authorizes qualified experts to offer opinion testimony if the subject matter is 'sufficiently beyond common experience' such that the expert's opinion 'would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) In general, "'[t]he subject matter of the culture and habits of criminal street gangs . . . meets this criterion.""" (*People v. Flores* (2020) 9 Cal.5th 371,

26

398; accord, *People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) "An expert opinion may be rendered in the form of responses to hypothetical questions that ask the expert to assume the truth of certain facts rooted in the evidence." (*Flores*, at p. 398; accord, *Vang*, at p. 1045.) "But 'the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . ."'" (*Flores*, at p. 398; accord, *Vang*, at p. 1046 ["'"Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?"'"].) We review the trial court's decision to admit or exclude expert testimony for an abuse of discretion. (*Flores*, at p. 397; *People v. Lindberg* (2008) 45 Cal.4th 1, 45; *People v. Gana* (2015) 236 Cal.App.4th 598, 612.)

### 3. *Moreno forfeited his claims of error*

Moreno contends the trial court erred in striking Flores's responses that the shooting was a spontaneous, unplanned, and unauthorized act because the opinion was in response to a hypothetical question. Moreno is correct that Flores did not improperly testify as to Moreno's specific intent, instead explaining that "[b]ased on the hypothetical" his opinion was that the shooting was a spontaneous, unplanned, and unauthorized act. (See *Vang, supra*, 52 Cal.4th at p. 1048 ["'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'"]; *People v. Perez* (2017) 18 Cal.App.5th 598, 607 ["While a gang expert is prohibited from

opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent."].)

However, we do not reach whether the trial court abused its discretion in excluding Flores's testimony and then admonishing him because Moreno forfeited his claim of error by failing to object. (Evid. Code, § 353, subd. (a); *People v. Cage* (2015) 62 Cal.4th 256, 282 ["Defendant forfeited his claims by failing to object to any of the testimony on the grounds he now raises."]; *People v. Fuiava* (2012) 53 Cal.4th 622, 721 ["'"In accordance with [section 353 of the Evidence Code], we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."'"].) The first time the trial court struck Flores's response for too closely addressing Moreno's specific intent, defense counsel only responded outside the presence of the jury, "I didn't know." The second time the court struck Flores's response, defense counsel was silent. Defense counsel likewise did not object when the trial court admonished Flores, even though it was done outside the presence of the jury.

To the extent Moreno argues the trial court's admonition chilled Flores's testimony in violation of Moreno's Sixth Amendment rights to present a defense, compulsory process, and due process, we agree the admonition was improper, but Moreno fails to show the admonition hampered Moreno's defense in violation of the Sixth Amendment. The tenor of the trial court's admonition was inappropriately harsh (especially given that it was based on an incorrect premise) and did not comport with the

28

obligation of a judge to "be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity . . . ." (Cal. Code of Jud. Ethics, canon 3B(4).) Although a judge may properly admonish a witness who has strayed from limitations the judge placed on the witness's testimony, the judge should never threaten a witness with a nonjudicial penalty, such as removing him or her from an expert panel (thereby threatening the expert's livelihood), as the judge did here. However, the record does not reflect that Flores was intimidated by the judge's admonition in responding to defense counsel's additional hypothetical. Indeed, as to defense counsel's third hypothetical based on the facts of this case, Flores again testified the shooting was not for the benefit of, at the direction of, or in association with a gang. Although the trial court struck Flores's response that the shooting was "spontaneous," the court allowed Flores to testify based on the hypothetical that "the people in the room were all caught by surprise."

The admonition at issue here is dramatically different from the intimidation at issue in *In re Martin* (1987) 44 Cal.3d 1, 30-32, relied on by Moreno. There, the California Supreme Court found a violation of the Sixth Amendment and the California Constitution where a defense witness was arrested as an accessory to murder in front of prospective defense witnesses immediately after his trial testimony, and as a result other defense witnesses refused to give substantive testimony out of fear of prosecutorial retaliation. (*In re Martin*, at pp. 33-34.) Moreno's reliance on *People v. Hill* (1998) 17 Cal.4th 800, 835, *People v. Schroeder* (1991) 227 Cal.App.3d 784, 789, 793, and *Webb v. Texas* (1972) 409 U.S. 95, 97-98 is similarly misplaced.

In *Hill*, the prosecutor improperly threatened a defense witness "in advance of trial with a perjury prosecution." (*Hill*, at p. 835 ["Threatening a defense witness with a perjury prosecution also constitutes prosecutorial misconduct that violates a defendant's constitutional rights."].) Similarly, in *Webb*, the United States Supreme Court held the trial court's "threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived [the defendant] of due process of law" where "the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole." (*Webb*, at p. 97-98.) In *Schroeder*, the trial court improperly dissuaded the defense witness from testifying "[b]y its frequent interruptions, admonishments and questions" concerning her privilege against self-incrimination, making it clear to the witness that the court disagreed with her decision to testify. (*Schroeder*, at p. 793.)

C. *The Trial Court Did Not Abuse Its Discretion in Providing Readback of Testimony Requested by the Jury*

1. *Readback of Roberts's testimony*

During jury deliberations, the jury sent a note requesting readback of Roberts's trial testimony. The jury wrote, "Requesting transcript of James Roberts['s] direct examination by prosecution. Looking for testimony related to defendant wanting relationship [with] victim and what the relationship was between James Roberts and the victim." The trial court informed the parties of the request and noted "[t]he jurors were quite specific."

30

Defense counsel responded, "That's true, your Honor.  However I think there is more discussion that came in through his audio that explains the relationship between him and the victim and the statements that he made regarding [Moreno] wanting a relationship with the victim.  That was in the audio portion played to them.  They have that back there but I don't know how the court wants to address that at all."

The court proposed giving the jurors "what is responsive to their request" and any exhibit on which the parties agreed.  The prosecutor responded, "Well, I don't want to infringe upon the jurors.  Your honor, I think this is exactly in line with what they requested and we'll see if they need more[,] they can ask for more."  Defense counsel replied, "I mean, I agree.  This is what is responsive but I don't think it answers the question that they're asking because that's all in his audio recorded statement that was played."  In response, the court stated, "I guess what we can do[,] say this is what is responsive and let them ask another question.  To me that's the safest."

After the court reporter read back Roberts's testimony, the trial court told the jury, "That's all the testimony that [relates] to the issues you addressed in your note.  So I'm going to send you back to deliberate.  If there is something further you think the court can do to assist you just write us a note like you did and we'll try to do our best to get the information for you."

31

## 2. *Governing law*

"Section 1138 gives deliberating jurors the right to rehear testimony and instruction on request."[15] (*People v. Solomon* (2010) 49 Cal.4th 792, 824; accord, *People v. Gurule* (2002) 28 Cal.4th 557, 649.) "Section 1138 'does not forbid giving the jury more than it requests so [that] it also receives the *context*' of the testimony." (*People v. Robinson* (2005) 37 Cal.4th 592, 635; accord, *People v. Hillhouse* (2002) 27 Cal.4th 469, 506.) However, the trial court "does not have to order read any part of the testimony not requested by the jury foreman." (*People v. Gordon* (1963) 222 Cal.App.2d 687, 689; see *People v. Ayala* (2000) 23 Cal.4th 225, 289 [where jury requested readback but stopped the readback because it had heard enough before reaching a verdict, "defendant could not have compelled the trial court to order the jury to continue to listen to the rereading of testimony"].) The trial court's response to the jury's request to rehear testimony is reviewed for an abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 968, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Gurule*, at p. 649.) "[A] violation of section 1138 ordinarily will not result in reversal of a conviction unless prejudice is shown . . . ." (*Robinson*, at p. 635.)

---

[15] Section 1138 provides, "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

3.     *The trial court did not abuse its discretion*

Moreno contends the trial court abused its discretion in failing to provide to the jury in response to its request for readback of Roberts's testimony a transcript (or playback) of Roberts's recorded police interview in which he discussed Moreno's desire for a relationship with McEveety and Roberts's relationship with McEveety. The trial court did not abuse its discretion.

As noted by the trial court, the jury requested readback of the "transcript of James Roberts['s] direct examination by prosecution."[16] The jury did not request a playback of Roberts's recorded police interview (or to review a transcript of the interview), nor did it request readback of testimony from Roberts's redirect examination, in which the prosecutor played the audio recording. Further, the trial court informed the jury after the readback, "If there is something further you think the court can do to assist you just write us a note like you did and

---

[16]     Moreno's reliance on *People v. Triplett* (2020) 48 Cal.App.5th 655 is misplaced. In *Triplett,* during deliberations the jury requested "transcripts" of two witnesses, which request the court denied without informing the jury it could have readback of the testimony. (*Id*. at pp. 659-660.) The Court of Appeal concluded this was error, explaining the trial court "erred in construing the jury's request narrowly as a request for transcripts—not a request for a readback of testimony—and in failing to inform or remind the jury of their right to a readback of testimony." (*Id*. at p. 662.) Here, the trial court properly construed the jury's request for a "transcript of James Roberts['s] direct examination by prosecution" as a request for readback of Roberts's trial testimony.

we'll try to do our best to get the information for you." The jury did not request anything further. As the court explained *People v. Gordon, supra*, 222 Cal.App.2d at page 689, "Had [the jurors] wanted further testimony read to them, or other further clarification, they certainly would have so requested. If the testimony actually read to them did not contain the matters they wished to hear, they surely would have said so." Moreover, the jury here was provided with the audio recording of Roberts's interview, admitted as a trial exhibit, along with a laptop to play the recording.[17]

D.    *The Trial Court Did Not Abuse Its Discretion in Overruling Moreno's Evidentiary Objections*

1.    *Detective O'Brien's statements to Roberts describing Moreno*

During Roberts's February 25, 2016 interview, Detective O'Brien stated as to Moreno, "Everybody tells us that this guy is—how do I put it? I'm not saying crazy. He's not crazy. He knows exactly what he's doing." Roberts responded, "Uh-huh."

_____

[17]    Moreno contends the court did not provide a laptop to the jury for it to play the audiotape, pointing to the prosecutor's closing argument in which he stated: "[K]eep in mind the audio is the evidence. [I]f you need headphones or playback you have that option available"; and "if you need playback of the audio be very precise what you are trying to listen to because that's going to take time to present to you." However, following counsel's closing arguments, the trial court instructed the prosecutor to provide a laptop, stating, "People to provide a clean laptop so [the jurors] can listen to the recordings." There is nothing in the record to suggest the jury did not have a laptop in the jury room to use to play the taped interview.

Detective O'Brien then said, "But he's—tries to be intimidating. Let me put it that way. Does that make sense to you?" Roberts replied, "Right."

The trial court overruled Moreno's objection to Detective O'Brien's statements that Moreno was "not crazy" and knew "exactly what he's doing." Notwithstanding the ruling, Moreno acknowledges the prosecutor excised Detective O'Brien's challenged statements from the audio recording before playing it to the jury. Although the jury was provided with the transcript of the Roberts interview, which included Detective O'Brien's statements, the trial court instructed the jury that the transcript was not evidence: "Ladies and gentlemen, I am admonishing you that the transcript is being provided to you to assist you. However, the actual evidence is the recorded voices on the CD. So if you believe there is a difference between the voices on the CD and the transcript, you must follow the recorded voices because that is evidence."

Moreno contends the trial court erred in overruling his evidentiary objection because Detective O'Brien did not have personal knowledge of Moreno's mental state. Moreno alternatively argues even if Detective O'Brien's statement was admissible, the statement should have been excluded because its probative value was substantially outweighed by the risk of undue prejudice because the statement that Moreno "knows exactly what he's doing" supported the People's theory the shooting was premeditated. (Evid. Code, § 352.) The trial court did not abuse its discretion.

"A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of

35

mind." (*People v. Sanchez* (2016) 63 Cal.4th 411, 456; *People v. Chatman* (2006) 38 Cal.4th 344, 397.) Moreno fails to show how Detective O'Brien's statements during the interview constituted an improper lay opinion about Moreno's mental state. Rather, the statement was made as part of an interview technique to encourage Roberts to talk about Moreno's involvement in the murder.

Moreover, any error in admitting Detective O'Brien's statements was harmless. We review the erroneous admission of evidence under the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. DeHoyos* (2013) 57 Cal.4th 79, 118; *People v. Fuiava* (2012) 53 Cal.4th 622, 671.) Under *Watson*, "'[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.'" (*People v. Watson* (2008) 43 Cal.4th 652, 686; accord, *People v. Partida* (2005) 37 Cal.4th 428, 439.) The prosecutor excised the statements from the audio recording played to the jury. Even though the transcript of the Roberts interview included Detective O'Brien's statements, the trial court properly instructed the jury to consider only the recorded voices on the audiotape as evidence. "We presume the jury followed the trial court's instruction absent evidence to the contrary." (*People v. Fayed* (2020) 9 Cal.5th 147, 192; accord, *People v. Flores* (2020) 9 Cal.5th 371, 405.) It is therefore not reasonably probable the verdict would have been more favorable to Moreno absent admission of the evidence. (*DeHoyos*, at p. 118; *Watson*, at p. 686; see Evid. Code, § 353, subd. (b).)

2. *Moreno's statements to the CI about killing witnesses*

During trial, Moreno objected to the admission of two statements he made indicating he should have killed the witnesses who left the garage after the shooting. Moreno told the CI, "I should've just handled all of them, right—right when they walked out the door, I'm plugging them, pop, pop, pop." Moreno later added, "I should have smoked everybody, fool." The prosecutor responded, "[Moreno] said he wishes there were no witnesses that were in the garage that he left alive, and that he should have killed everyone present in the garage at the time. [¶] I'd argue it's directly relevant and goes to his consciousness of guilt." The trial court overruled Moreno's objections, acknowledging its obligation to perform a balancing of the factors under Evidence Code section 352.

Moreno contends his statements were inadmissible under Evidence Code section 1101, subdivision (a), because their sole relevance was to show his propensity to commit violent crimes. Evidence Code section 1101, subdivision (a), provides, with exceptions not applicable here, "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Moreno's statements that he should have killed the witnesses to the shooting were admitted to show consciousness of guilt, not as character evidence. (See *People v. Anderson, supra*, 5 Cal.5th at p. 391 ["Evidence showing consciousness of guilt . . . is generally admissible within the trial court's discretion."]; *People v. Jones* (2017) 3 Cal.5th 583, 604, 606-607, 609-610 [trial court did not abuse its discretion in admitting taped conversation in which defendant in custody told

37

his brother he needed a district attorney "hit" and wanted a transcript of proceedings (arguably to intimidate witnesses), and brother said he had given away two pistols (arguably linked to murder), to show consciousness of guilt].)

Further, the trial court did not abuse its discretion in declining to exclude the statements under Evidence Code section 352 because the statements' probative value was not substantially outweighed by undue prejudice. ""The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405-407.) "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.""" (*People v. Jones, supra*, 3 Cal.5th at p. 610; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105 [""Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.""].) "'[T]he trial court is vested with wide discretion

38

in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value.  Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*Hardy*, at p. 87; accord, *Bell*, at p. 71.)

The evidence that Moreno wished he had concealed his crime by killing the witnesses is harmful to Moreno precisely because it is relevant to Moreno's guilt, not because it is designed to evoke an emotional reaction in the jury.  Thus, the trial court did not abuse its discretion in overruling Moreno's objection to admission of the statements under Evidence Code section 352.[18]

E.    *The Trial Court's Instructional Error on the "Primary Activities" Element of the Gang Enhancement Was Harmless*

1.    *Governing law*

"[Section 186.22,] subdivision (b)(1) enhances the sentence for any 'felony committed for the benefit of . . . any criminal street gang.'  The definition of a criminal street gang in section 186.22, subdivision (f) requires that the gang have 'as one of its primary activities' the commission of one or more of the criminal acts enumerated in subdivision (e).  Evidence of both past offenses

---

[18]    Moreno contends the trial court's errors were cumulatively prejudicial.  Because we reject Moreno's claims of error or find any error was harmless, there was no cumulative prejudice. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 672 [jury instruction error and three assumed errors were "not prejudicial when considered cumulatively"]; *People v. Powell* (2018) 6 Cal.5th 136, 194 [no cumulative prejudice where "[a]ny errors, actual or arguable, were minor"]; *People v. Edwards* (2013) 57 Cal.4th 658, 746 [no cumulative prejudice because there was no error, or if assuming error, there was no prejudice].)

and the currently charged offenses may be considered in determining whether one of the primary activities of the gang is committing one or more of the offenses enumerated in the statute."  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1068; accord, *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*) ["The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations."].)  "'Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony . . . .'"  (*Nguyen*, at p. 1068, quoting *Sengpadychith*, at p. 324.)

Under section 186.22, subdivision (e), the enumerated crimes include: "(1) Assault with a deadly weapon or by means likely to produce great bodily injury as defined in Section 245"; "(3) Unlawful homicide or manslaughter as defined in Chapter 1 (commencing with Section 187) of Title 8"; "(9) Grand theft, as defined in in subdivision (a) or (c) of Section 487"; "(10) Grand theft of any firearm, vehicle, trailer or vessel"; "(19) "Felony extortion, as defined in Sections 518 and 520"; and "(25) Theft and unlawful taking or driving of a vehicle, as defined in Section 10851 of the Vehicle Code."

For felonies punishable by a determinate term of imprisonment (here, the firearm possession charge), a trial court's error in instructing on an element of the gang enhancement is federal constitutional error reviewable under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) because the gang enhancement

increases the punishment for the offense.  (*Sengpadychith, supra*, 26 Cal.4th at p. 320.)  Under *Chapman*, reversal is required "unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict."  (*Sengpadychith*, at p. 326; accord, *People v. Lamas* (2007) 42 Cal.4th 516, 526; see *Chapman*, at p. 24.)

For felonies punishable by a life sentence where the gang enhancement does not increase the mandatory minimum term the defendant must serve (here, the murder charge), instructional error on an element of the gang enhancement is only a violation of California law, which we review under the harmless error standard in *Watson, supra*, 46 Cal.2d at page 836.  (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 39 & fn. 6 [applying *Watson* harmless error standard because gang enhancement did not increase minimum term of 25 years in prison for first degree murder]; *Sengpadychith, supra*, 26 Cal.4th at pp. 320-321.)  Under *Watson*, we assess whether it is reasonably probable that a result more favorable to the defendant would have been reached had the jury been correctly instructed.  (*Nunez and Satele*, at p. 39; see *Watson*, at p. 836.)

2.      *The gang testimony and jury instruction*

Detective Soliz testified, "The [gang's] primary activities goes from the misdemeanor cases to petty theft, assault, to grand theft, vehicle thefts, attempted murders, murder.  I've handled cases where we actually had an Artesia gang member for extortion and assault on a peace officer."  Further, Detective Soliz testified about two predicates acts:  (1) an Artesia 13 gang member was convicted of an October 2009 assault with a deadly weapon; and (2) another Artesia 13 gang member was convicted

41

of an August 2009 assault with a semiautomatic firearm.  On cross-examination, Detective Soliz testified that in 2012 he suspected the Artesia 13 gang committed three murders, but he "couldn't prove it."  In 2013 there were six suspected gang-related murders; in 2014 there was one; and in 2018 there were four.  However, Detective Soliz testified that since 2012 Artesia 13 gang members committed 60 to 70 attempted murders or assaults with a deadly weapon.  Car thefts "fluctuat[ed] between 60 to 100 through the years."  Detective Soliz was unable to give a precise number for petty and grand thefts because thefts were "almost . . . everyday action[s]."

The trial court instructed the jury with CALCRIM No. 1401, as modified, which stated, "In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.  [¶] A pattern of criminal gang activity, as used here, means:  [¶] 1. The commission or conviction of any combination of two or more of the following crimes: theft, vehicle theft, extortion, assault, attempted murder and murder;  [¶]  2. At least one of those crimes was committed after September 26, 1988;  [¶]  3. The most recent crime occurred within three years of one of the earlier crimes; and  [¶]  4. The crimes were committed on separate occasions or were personally committed by two or more persons.  [¶]  . . .  [¶]  If you find the defendant guilty of a crime in this case you may consider that crime in deciding whether one of the group's primary activities was commission of that crime, and whether a pattern of criminal gang activity has been proved."

3. *The instructional error was harmless*

Moreno contends, the People concede, and we agree the trial court's jury instruction on the "primary activities" element was erroneous.[19] The jury instruction failed to specify a qualifying assault must be with a deadly weapon or by means likely to produce great bodily injury (§ 186.22, subd. (e)(1)), and a qualifying theft must be grand theft or theft of a firearm, trailer, or vehicle (§ 186.22, subds. (e)(9), (e)(10) & (e)(25)).

However, the instructional error was harmless beyond a reasonable doubt.[20] (*Sengpadychith, supra*, 26 Cal.4th at p. 327;

---

[19] The People argue Moreno forfeited his claim of error because his attorney consented to the jury instruction on the primary activities element. But we review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.'"]; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 544 [same].) Of course, "[w]e can only determine if [a] defendant['s] substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial." (*People v. Medina* (2019) 33 Cal.App.5th 146, 154, fn. 7.) That is, if Moreno's claim has merit, it has not been forfeited. We therefore necessarily review the merits of his contention there was instructional error.

[20] Because the *Chapman* harmless error standard under *Chapman, supra*, 386 U.S. at page 24 applies to count 2 for possession of a firearm by a felon, we apply this more stringent standard for our analysis.

43

*Lamas, supra*, 42 Cal.4th at p. 526; see *Chapman, supra*, 386 U.S. at p. 24.)  Detective Soliz testified about two predicates acts of assault with a deadly weapon and assault with a firearm in 2009, both qualifying offenses under section 186.22, subdivision (e)(1).  Further, Detective Soliz testified gang members committed 60 to 70 attempted murders and assaults with a deadly weapon.  Detective Soliz also testified gang members committed between 60 to 100 car thefts, which are qualifying offenses under section 186.22, subdivisions (e)(10) and (e)(25).  Detective Soliz's testimony that gang members consistently and repeatedly committed assaults with a deadly weapon and car thefts was sufficient to prove the gang's primary activities.  (See *People v. Nguyen, supra*, 61 Cal.4th at p. 1068 [gang expert's testimony "that some of primary activities of the Nip Family gang were 'homicides, attempted homicides, assaults, assault[s] with deadly weapons, home invasion robberies, burglaries, auto theft, [and] narcotic sales'" was sufficient evidence]; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226 ["proof of the 'primary activities' element was satisfied through testimony by a police gang expert" of gang's "criminal actions that constituted predicate crimes under the gang statute"].)

F.      *The Trial Court Did Not Err in Refusing to Stay the Sentence for Possession of a Firearm by a Felon*
        1.      *Moreno's request to stay the sentence on count 2*
        At sentencing, defense counsel argued the sentence for count 2 should be stayed under section 654 because there was no evidence Moreno possessed the firearm prior to or after the murder.  The trial court found section 654 did not apply, explaining, "I understand the statement of law and the

44

arguments of counsel that obviously [section] 654 is a very fact-driven decision.  However, they do require different intents and based upon that and the facts gleaned at trial, I don't believe [section] 654 applies.  However, I will indicate that based upon the facts of the trial although this was a heinous killing, a killing for no reason, there was testimony about where the gun came from, from one of the individuals at trial, it was sort of a gang gun which is common that a particular gang possesses the gun then it's sort of moved around or it's used in different crimes or held in a gang location for purpose of committing crimes.  [¶]  So given that that's the only testimony the court does accept the testimony.  It also makes sense, given the other facts in the trial."

2.      *Governing law*

Section 654, subdivision (a), provides in part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an "act or omission" may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311; accord, *People v. Kelly* (2018) 28 Cal.App.5th 886, 904.)  "We first consider if the different crimes were completed by a 'single physical act.'" (*Corpening*, at p. 311; accord, *People v. Jones* (2012) 54 Cal.4th 350, 358.)  "If so, the defendant may not be punished more than once for that act.  Only if we conclude that

45

the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives." (*Corpening*, at p. 311; accord, *Jones*, at p. 359.) "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Corpening*, at p. 313.)

"Whether multiple convictions are based upon a single act is determined by examining the facts of the case." (*People v. Mesa* (2012) 54 Cal.4th 191, 196; accord, *People v. Corpening, supra*, 2 Cal.5th at p. 312.) Similarly, "[i]ntent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 354; accord, *People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618; accord, *Vasquez*, at p. 737 ["In analyzing whether section 654 bars the imposition of multiple sentences, we consider the evidence in the light most favorable to the judgment and affirm the trial court's sentencing decision— whether express or implied—if it is supported by substantial evidence."].) But "[w]hen th[e] facts are undisputed . . . the application of section 654 raises a question of law we review de novo." (*Corpening*, at p. 312.)

46

3.     *Section 654 does not apply to Moreno's conviction for possession of a firearm by a felon*

Moreno contends the trial court erred in refusing to stay his conviction of possession of a firearm by a felon because he did not possess the rifle until he arrived at the house, retrieved the rifle from under the sofa, and used it to shoot McEveety. The trial court did not err.

Many appellate courts have addressed the circumstances in which section 654 applies to a conviction of possession of a firearm where the firearm was used to commit another offense. As the Court of Appeal explained in *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217, "[S]ection 654 applies where the defendant obtained the prohibited weapon *during* the assault in which he used the weapon." (Accord, *People v. Bradford* (1976) 17 Cal.3d 8, 22 [defendant who seized officer's revolver and fired several shots at officer could not be punished for both assault with a deadly weapon on a peace officer and possession of a firearm by a felon because "[d]efendant's possession of [the officer's] revolver was not 'antecedent and separate' from his use of the revolver in assaulting the officer"].)

But "section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1145; accord, *People v. Venegas* (2020) 44 Cal.App.5th 32, 38 [possession of gun by felon was conduct divisible from commission of murder because defendant possessed the gun before arriving at the murder scene].) Further, section 654 does not bar punishment for possession of a firearm where the defendant possesses the firearm after the primary offense. (*People v. Garcia* (2008) 167 Cal.App.4th 1550,

47

1565-1566 (*Garcia*) [§ 654 inapplicable where defendant used firearm to commit two robberies, then was arrested in different location with firearm]; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413-1414 [§ 654 did not apply where defendant possessed handgun before, during, and after the robberies]; cf. *People v. Atencio* (2012) 208 Cal.App.4th 1239, 1247 [§ 654 applied to defendant's continued possession of gun, distinguishing *Garcia* on the basis the defendant's "use of the gun in the robberies and his continued possession of the gun after the robberies, including at the time he contemplated a shootout with police, were distinguishable for purposes of section 654"].)

Substantial evidence supports the trial court's refusal to stay the sentence for firearm possession by a felon under section 654.[21] According to Roberts, Moreno grabbed the rifle case from under the couch, took out the rifle from its case, and held the rifle for two minutes on his lap before shooting McEveety. Arguably, Moreno's retrieval and possession of the firearm was solely for the purpose of shooting McEveety (a single intent and objective), with Moreno only possessing the firearm for two minutes.

---

[21] Although the trial court in finding section 654 did not apply focused on the gun being a "gang gun" that moved around, the court also stated there were different intents "given the other facts in the trial." We will uphold the trial court's implied determination that the murder and firearm possession were separate crimes involving separate intents and objectives if it is supported by substantial evidence. (*People v. Brent, supra*, 53 Cal.4th at p. 618 ["A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence."]; accord, *People v. Vasquez, supra*, 44 Cal.App.5th at p. 737 [same].)

However, as in *Garcia, supra*, 167 Cal.App.4th at pages 1565-1566, Moreno retained possession of the rifle after the shooting (according to Moreno's own account to the CI), throwing the barrel in the ocean and burning the rest of the weapon. The murder and continued possession of the firearm to destroy the evidence therefore reflects two separate intents and objectives. (See *People v. Corpening, supra*, 2 Cal.5th at p. 311.)

G.  *The Abstract of Judgment Must Be Corrected*

In addition to the firearm enhancement the trial court imposed on count 1 under section 12022.53, subdivision (d), the trial court imposed a 10-year firearm enhancement under section 12022.53, subdivision (b), and a 20-year firearm enhancement under 12022.53, subdivision (c), both of which it stayed pursuant to section 12022.53, subdivision (f). However, the abstract of judgment incorrectly states the court imposed and stayed two firearm enhancements under section 12022.53, subdivision (c). Moreno contends, the People concede, and we agree the abstract of judgment must be corrected to conform to the trial court's imposition and stay of a firearm enhancement on count 1 under section 12022.53, subdivision (b). (*People v. Jones* (2012) 54 Cal.4th 1, 89 ["When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties."]; *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time . . . ."].)

H.    *Moreno Is Entitled to an Ability-to-pay Hearing on the Assessments and Fines Imposed by the Trial Court*

In his supplemental opening brief, Moreno requests we remand for the trial court to conduct a hearing on his ability to pay $60 in court facilities assessments, $80 in court operation assessments, the $300 restitution fine, and the parole revocation restitution fine in the same amount. Moreno notes the probation report indicated he was unemployed and "disabled and in a wheelchair" at the time of sentencing. In response, the People contend Moreno forfeited his constitutional challenges and did not show his inability to pay the fees and fines in the trial court. The People also argue imposition of the fines did not violate the excessive fines clause of the Eighth Amendment. Moreno is entitled to an ability to-pay hearing pursuant to this court's opinion in *Dueñas, supra*, 30 Cal.App.5th at page 1160.

1.    Dueñas *and its progeny*

In *Dueñas*, this court concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168; accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655 (*Belloso*), review granted Mar. 11, 2020, S259755.)[22] In contrast to court

---

[22] Several Courts of Appeal have applied this court's analysis in *Dueñas* (e.g., *People v. Santos* (2019) 38 Cal.App.5th 923,

assessments, a restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas*, at p. 1169; accord, *Belloso*, at p. 655.) Section 1202.4, subdivision (c), expressly provides a defendant's inability to pay a restitution fine may not be considered as a "compelling and extraordinary reason" not to impose the statutory minimum fine. However, as this court held in *Dueñas*, to avoid the serious constitutional questions raised by imposition of a restitution fine on an indigent defendant, "although the trial court is required by Penal Code section 1202.4 to impose a restitution fine, the court must stay the execution of

929-934; *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted Nov. 13, 2019, S257844 [applying due process analysis to court assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035), or partially followed *Dueñas* (e.g., *People v. Valles* (2020) 49 Cal.App.5th 156, 162-163, review granted July 22, 2020, S262757 [concluding due process requires ability-to-pay hearing before imposition of court facilities fee, not restitution fines]). Other courts have rejected this court's due process analysis (e.g., *People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946), or concluded the imposition of fines and fees should be analyzed under the excessive fines clause of the Eighth Amendment (e.g., *People v. Cowan* (2020), 47 Cal.App.5th 32, 42, review granted June 17, 2020, S261952; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061; *Kopp*, at pp. 96-97 [applying excessive fines analysis to restitution fines]). The Supreme Court granted review of the decision in *Kopp* to decide the following issues: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?"

the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, at p. 1172; accord, *Belloso*, at p. 655.)

In *Belloso* we rejected the argument "a constitutional challenge to imposition of fines and fees on an indigent defendant should be analyzed under an excessive fines analysis instead of a due process framework." (*Belloso, supra*, 42 Cal.App.5th at p. 660.)  We observed, "As the California Supreme Court explained in [*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728], in its analysis of the constitutionality of civil penalties imposed by the trial court, 'It makes no difference whether we examine the issue as an excessive fine or a violation of due process.'" (*Belloso*, at p. 660.)

### 2.  *Moreno did not forfeit his challenge to the imposition of the assessments and fees*

The People contend Moreno forfeited his challenge to imposition of the assessments and fines because he did not assert his inability to pay at sentencing.  However, at the time Moreno was sentenced, *Dueñas* had not yet been decided, and we have declined to find forfeiture based on a defendant's failure to object to fines and fees prior to our opinion in *Dueñas*.  As we explained in *People v. Castellano* (2019) 33 Cal.App.5th 485, 489, "[N]o California court prior to *Dueñas* had held it was unconstitutional to impose fines, fees or assessments without a determination of the defendant's ability to pay. . . .  When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture." (Accord, *Belloso, supra*, 42 Cal.App.5th at p. 662;

*People v. Santos* (2019) 38 Cal.App.5th 923, 931-932; *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138; contra, *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464 [defendant forfeited challenge by not objecting to the assessments and restitution fine at sentencing]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154 [same].)

In light of Moreno's burden to prove his inability to pay (*People v. Castellano, supra*, 33 Cal.App.5th at page 490), we remand the matter to the trial court to give Moreno an opportunity to request an ability-to-pay hearing and to present evidence of his inability to pay the assessments and fines.

## DISPOSITION

The superior court is directed to prepare a corrected abstract of judgment that reflects the court's imposition and stay of firearm enhancements on count 1 under section 12022.53, subdivisions (b) and (c). The judgment is affirmed as modified. The matter is remanded for the trial court to allow Moreno to request a hearing and present evidence demonstrating his inability to pay the court assessments and restitution fines. The superior court is directed to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


FEUER, J.

We concur:


PERLUSS, P. J.          SEGAL, J.


53